# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

JEREMY MIKEL OSBORN,

     *Plaintiff*,

*v.*                           CASE NO. 2:14-CV-10832

CAROLYN W. COLVIN          DISTRICT JUDGE PATRICK J. DUGGAN
Commissioner of Social Security,     MAGISTRATE JUDGE PATRICIA T. MORRIS

     *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.   RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and that Defendant's Motion for Summary Judgment be **GRANTED**.

## II.   REPORT

### A.   Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for Disability Insurance Benefits ("DIB") under

---

[1] The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Title II of the Social Security Act 42 U.S.C. § 401-34. The matter is currently before the Court on cross-motions for summary judgment. (Docs. 9, 12.)

Plaintiff Jeremy Mikel Osborn was thirty-three years old during the most recent administrative hearing. (Transcript, Doc. 5 at 30, 142.) Plaintiff's work history includes jobs as a truck driver, machinist, alarm technician, and exterminator. (Tr. at 24, 180-84.) Plaintiff first filed for benefits on August 11, 2008, alleging that he became disabled on February 18, 2008. (Tr. at 59.) The claim was denied initially. (*Id.*) Plaintiff asked for a hearing in front of an Administrative Law Judge ("ALJ"), who would consider the application de novo. (Tr. at 59.) ALJ Troy Patterson convened the hearing on March 30, 2010. (Tr. at 59, 66.) At the hearing, Plaintiff requested a "closed period of disability from February 18, 2008 through April 1, 2009." (Tr. at 59.)

In his decision dated April 23, 2010, the ALJ found that Plaintiff was totally disabled during that closed period. (Tr. at 59, 65.) However, the ALJ noted that in April 2009 Plaintiff completed truck driving school, found work two months later, and had stayed employed through the hearing. (Tr. at 64.) Citing regulations controlling when a disability ends, 20 C.F.R. § 404.1594, the ALJ determined that on April 2, 2009, Plaintiff's condition improved and he could then function in a full range of light work. (Tr. at 65.) Given his age, education, and work experience, the regulations required the ALJ to find Plaintiff not disabled at that point. (*Id.*); 20 C.F.R. pt. 404, subpt. P, App. 2, R. 202.21.

On December 12, 2011, Plaintiff filed the present claim for DIB, alleging that he became unable to work on May 20, 2010. (Tr. at 142.) The Commissioner considered whether Plaintiff had arthropathies and affective disorders, and denied the claim at the initial administrative stage. (Tr. at 82.) Plaintiff appeared before ALJ Michael R. McGuire on October 23, 2012, for de novo

review of his claim. (Tr. at 30-52.) In his written decision issued November 9, 2012, the ALJ noted that absent new and material evidence that Plaintiff's condition deteriorated, he was bound by the prior ALJ decision finding Plaintiff could perform light work after April 2, 2009. (Tr. at 22.) He noted that new evidence justified a more restrictive assessment of Plaintiff's capacities. (Tr. at 21-24.) Nevertheless, even under these restrictions, the ALJ found Plaintiff was not disabled. (Tr. at 18, 26.)

A few weeks later, Plaintiff requested a review of this decision. (Tr. at 12.) The ALJ's decision became the Commissioner's final decision, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on December 24, 2013, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-3.) On February 22, 2014, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision. (Pl.'s Compl., Doc. 1.)

## B.    Standard of Review

The Social Security system has a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the factual determinations to ensure they are supported by substantial evidence. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The administrative process provides multiple opportunities for reviewing the state agency's initial determination. The Plaintiff can first appeal the decision to the Social Security Agency, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). Once this administrative process is complete, an unsuccessful claimant may file an action in federal district court. *Sullivan v. Zebley*, 493 U.S. 521, 524-28 (1990), *superseded by statute on other grounds*, Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction under 42 U.S.C. § 405(g) to review the Commissioner's final administrative decision. The statute limits the scope of judicial review, requiring the Court to "'affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The court's review of the decision for substantial evidence does not permit it to "'try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.'" *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations

based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). *See also Mullen*, 800 F.2d at 545. The court can only review the record before the ALJ. *Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). *See also Jones*, 336 F.3d at 475. "[T]he . . . standard is met if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Longworth*, 402 F.3d at 595 (quoting *Warner*, 375 F.3d at 390). "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

A court's review of the Commissioner's factual findings for substantial evidence must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th

Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999))).

### C.   Governing Law

"'The burden lies with the claimant to prove that she is disabled.'" *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) (quoting *Foster*, 279 F.3d at 353). *Accord Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994)). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. §§ 401-34, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. §§ 1381-85. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty-stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

6

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston*, 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones*, 336 F.3d at 474. *See also Cruse*, 502 F.3d at 540. The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given her RFC [residual functional capacity] and

considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.   ALJ Findings

The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since the application date and met the insured status requirements through September 30, 2015. (Tr. at 20.) At step two, the ALJ concluded that new evidence showed Plaintiff had the following severe impairments: "chronic left ankle pain status post fracture and open reduction internal fixation and obesity." (Tr. at 20-24.) At step three, the ALJ found that Plaintiff's combination of impairments did not meet or equal one of the listings in the regulations. (Tr. at 21.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. at 24.) The ALJ also found that Plaintiff was thirty-one years old on the application date, putting him in the "younger individual age" category. (Tr. at 24.) *See* 20 C.F.R. §§ 404.1563, 416.963. At step five, the ALJ found that Plaintiff could perform a limited range of light work in jobs existing in significant numbers in the regional economy. (Tr. 20-25.)

### E.   Administrative Record

### 1.   Medical Records

The medical records begin with indecipherable notes from Dr. Janet Bach's office, appearing to mention a few visits in 2006 and 2007. (Tr. at 219.) The first legible record comes from a February 2008 imaging report written by Dr. Timothy Berka. (Tr. at 210-11.) Plaintiff's right foot displayed "a small amount of irregularity" and sclerosis, along with "a small plantar calcaneal spur." (Tr. at 210.) The left foot similarly appeared to have "some mild irregularity and sclerosis," and "[a] small to moderate size plantar calcaneal spur . . . ." (*Id.*) The diagnosis was

"[b]ilateral talar beaking with changes consistent with bilateral calcaneonavicular coalition." (*Id.*) In lay terms, it seems that his heel bone (the calcaneus) coalesced or fused to (coalition) with a bone on the top of his foot near the leg (the navicular bone.) 1 J.E. Schmidt, *Attorneys' Dictionary of Medicine and Word Finder* B-53, C-10, C-11 (2013) (defining beaking, calcaneonavicular, and calcaneus); 2 *id.* at C-330 (defining medical coalescence); 5 *id.* at T-12, T-25 (defining talar and talus); Vidyadhar V. Upasani, et al., *Analysis of Calcaneonavicular Coalitions Using Multi-Planar Three-Dimensional Computed Tomography*, J. Children's Orthapedics, 301, 301-02 (2008) (discussing calcaneonavicular coalitions). This connection is evidenced by the beaking of the Talus bone, which is located above the heel bone and between it and the navicular bone. *Id.* The Plaintiff also had calcaneal spurs, or heel spurs, Mark H. Beers & Robert Berkow, eds., *The Merck Manual of Diagnosis and Therapy* 485 (17th ed. 1999).

On March 11, 2008, Plaintiff underwent surgery on his left foot. (Tr. at 208-09.) The diagnosis both before and after the procedure was severe pes planus (flatfoot), *see* 4 Schmidt, *Attorneys' Dictionary*, at P-200, caused by the calcaneonavicular coalition. (Tr. at 208.) There were no complications and Plaintiff left the operating room in stable condition. (Tr. at 208-09.)

Dr. Bach examined Plaintiff on March 12, 2009. (Tr. at 226.) Plaintiff mentioned no problems in any major system, such as musculoskeletal or gastrointestinal, and the physical examination did not uncover any either. (Tr. at 226-27.) However, on October 17, 2009, Plaintiff slipped while climbing down from his truck trailer at work. (Tr. at 246.) Pain immediately shot through his left ankle, at about level six-out-of-ten on a visual analog ("VA") scale. (*Id.*) Moving the ankle exacerbated the pain; resting alleviated it. (*Id.*) Two days later, on October 19, Plaintiff went to Concentra Medical Center. (Tr. at 246.) Physician's assistant Patrick Kerr examined the

ankle, noting tenderness, limited range of motion, and mild swelling. (Tr. at 247.) Plaintiff limped slightly, but the ankle was not deformed or unstable. (*Id.*) The ankle was sprained, Mr. Kerr concluded, recommending Ibuprofen, an ankle brace, and physical therapy for one to two weeks. (*Id.*) Plaintiff should also ice and elevate the ankle, and refrain from prolonged standing or walking, Mr. Kerr added. (Tr. at 247-48.) Plaintiff could not return to his work, driving trucks, until he healed. (Tr. at 248.) In October 2009, an x-ray of Plaintiff's left ankle came back "normal," though the report noted an "inferior calcaneal spur." (Tr. at 228.) The radiologist also observed that Plaintiff's prior fracture was "stabilized with three threaded bolts." (*Id.*)

The following week, Plaintiff returned to Dr. Bach, complaining of pain and decreased range of motion in his left ankle. (Tr. at 224.) The examination notes confirmed the limited range of motion and noted a limp, but mention only mild tenderness and swelling. (Tr. at 225.) Dr. Bach recommended Ibuprofen and a Cam Boot and planned to refer him to an orthopedic specialist. (Tr. at 224.)

In early November, Plaintiff reported to Dr. Bach that the pain and swelling persisted, though the boot eased the pain. (Tr. at 222.) The ankle was now moderately swollen and tender, according to Dr. Bach's examination notes, and its movement remained limited. (Tr. at 223.) Dr. Bach reaffirmed her ankle sprain diagnosis, again recommended Ibuprofen, ordered an x-ray, and determined he could not return to work for two to three weeks. (Tr. at 222.) No significant changes occurred by his next appointment, on November 24, 2011, the Ibuprofen and splint giving minimal help. (Tr. at 220.) However, the examination report noted only mild swelling and tenderness, along with the continuing difficulty moving the ankle. (Tr. at 221.) The left ankle sprain diagnosis

remained, and Dr. Bach added a right foot contusion diagnosis without explaining why. (Tr. at 220.)

Plaintiff visited physical therapists eighteen times through the middle of February 2010. (Tr. at 249-307.) The diagnosis in all visits was ankle sprain. (*Id.*) Plaintiff attended his first physical therapy session with Michael Van Rooijen on December 17, 2009. (Tr. at 249.) Plaintiff began by explaining his job. He had worked as a truck driver for Swift Transportation for six months. (*Id.*) The position required him to lift and carry up to seventy-five pounds, climb, and drive. (*Id.*) Since the accident, Plaintiff indicated that "they are working modified activity," leaving it unclear whether he stayed at work. (*Id.*) He rated his pain at level five, presumably out of ten, and noted his limited movement and his need to rest to alleviate the pain. (*Id.*) Mr. Van Rooijen observed that the x-rays were "negative." (*Id.*) During the examination, he noted Plaintiff had flatfoot (pes planovalgus) in both feet. (Tr. at 250.) Testing confirmed the limited motion; but Plaintiff's strength was around four-out-of-five in every measure. (*Id.*) His knee strength and movement was normal, and special ankle tests were negative. (Tr. at 251.)

Mr. Van Rooijen wrote that Plaintiff had reduced ability to drive trucks, climb, lift, and push and pull. (*Id.*) The impairments were reduced motion, pain, decreased muscled performance, and impaired gait. (*Id.*) In what appears to be a boilerplate assessment, the report states, "These impairments prevent the patient from performing their [sic] standard activities of daily living and work activities." (*Id.*) The goals included normalizing his gait, increasing his climbing ability, and building his strength to pre-accident level. (*Id.*) Twelve to fourteen visits were planned. (Tr. at 252.) The first working appointment took place the following day. (Tr. at 254.) Plaintiff reported his ankle was "doing ok," with soreness after performing his home exercise program. (*Id.*) The

11

pain registered anywhere from level two to level five on a VA scale. (*Id.*) His gait was normal while wearing the Cam Boot, though it does not appear they tested his gait without it; his ankle remained tender and had decreased motion and strength. (*Id.*) Mr. Van Rooijen thought Plaintiff's symptoms were unchanged, though the exercises did not provoke any adverse reactions. (Tr. at 255.) His strength levels remained constant. (*Id.*)

The findings from the next few visits generally mirror those from the first two appointments: His gait remained normal while wearing the boot, again with no indication of how he walked without one, (Tr. at 257); his pain hovered around level five, (Tr. at 257); Plaintiff said he was on "modified activity" at work, (Tr. at 257, 260, 263, 266, 269, 272); he continued his home exercise program, (Tr. at 257, 260); his ankle lacked full mobility, its strength stayed at level four-out-of-five, and it was tender on examination, (Tr. at 257-58, 260-61, 263, 266); and he continued to complain the ankle ached. (Tr. at 259-60.) Starting on the December 23 visit, Plaintiff's gait became "[a]ntalgic with decreased weight bearing on [his] affected side." (Tr. at 260, 266.) That visit was also his first with physical therapist Chinthana Herath, who randomly substituted for Mr. Van Rooijen throughout the sessions. (Tr. at 260.) She remarked that his condition had not changed. (Tr. at 260.) On December 28, Plaintiff stated he was "feeling [a] little better today," and his ankle strength had increased slightly. (Tr. at 263.) Mr. Van Rooijen concluded that Plaintiff was "progressing." (Tr. at 264.) Improvements continued into the next week, when Plaintiff reported increased flexibility and decreased pain. (Tr. at 266.) Ms. Herath concurred. (*Id.*)

Plaintiff reported continued soreness during the next session, though his pain rating remained at the lower level he announced on December 28. (Tr. at 269.) His mobility had

increased, his strength was now five-out-of-five, and his gait was "minimally antalgic" without any medical footwear, an improvement according to Mr. Van Rooijen. (Tr. at 269-70.) The next day, Plaintiff repeated his claim that the pain was diminishing and the therapist observed that his gait had improved. (Tr. at 272.) He could complete fifteen repetitions climbing a ladder and could "[p]ush/pull" a seventy-five pound sled for ten feet. (Tr. at 273.) He remained roughly the same during the next visit, he reported. (Tr. at 275.) The limp and soreness were still present, but the swelling decreased, his gait improved, and he repeated his scores in the climbing and "[p]ush/pull" tests. (Tr. at 275-76.) The following report was nearly identical; Plaintiff remarked he felt the same, though walking increased his soreness. (Tr. at 278-80.) However, during the following appointment Plaintiff noted improvements and the therapist agreed. (Tr. at 281.)

At the end of January, Plaintiff's pain increased and the therapist found tenderness. (Tr. at 284.) Nonetheless, he had locked in his gains on the climbing and "[p]ush/pull" tests, and the therapist concluded that he continued to progress. (Tr. at 285.) Before his next visit, on February 3, he felt his ankle "pop" while using the stairs, causing it to hurt more than it had in late December and January. (Tr. at 288.) His gait remained antalgic. Still, he completed the "[p]ush/pull" test and his ankle strength stayed the same. (Tr. at 288-89.) By the following day, however, his pain and swelling decreased, and his gait was "minimally antalgic." (Tr. at 291.) He could climb and push the sled as well as he had in the previous visits, and his ankle strength tested at a consistent level. (Tr. at 291-92.)

Aside from a more antalgic gait, his final three sessions progressed similarly. (Tr. at 294-304.) In the penultimate session, Plaintiff noted that he recently tripped and banged his left foot, increasing the pain. (Tr. at 300.) Walking and standing for over thirty minutes aggravated his

ankle. (*Id.*) Nonetheless, the notes express that he continued to improve. (Tr. at 301.) During the final recorded session, Plaintiff noted the persisting pain; however, overall he was "doing better," the swelling continued to decrease, and his gait was once again "minimally antalgic." (Tr. at 304.) His ankle was stiff but had normal strength, and he could climb up and down a ladder and push or pull seventy-five pounds. (Tr. at 304-05.) Mr. Van Rooijen recommended discontinuing therapy. (Tr. at 306.) Around the same time, Dr. Kent Biddinger prescribed a pair of personally molded shoe inserts after diagnosing foot, heel, and ankle contusion. (Tr. at 231-34.)

The record then leaps two years to Plaintiff's mental consultative examination with Dr. George Pestrue in March 2012. (Tr. at 309-13.) Asked to describe his status, Plaintiff began with his physical maladies, the source of his emotional challenges. (Tr. at 309.) Both feet bothered him, but the left ankle particularly impeded daily life: "I can stand for about four hours roughly . . . Then my ankle gets swollen and sore and I'll have to sit down . . . I can probably walk a quarter mile and then I have to sit down." (*Id.*) He could not "lift much" and could not squat at all. (*Id.*) "Even sitting bothers my ankle," he added, forcing him to stand "after sitting for long and then I have to sit after standing for long." (*Id.*) Elevating his ankle helped, but "[s]ome mornings I can hardly walk at all," especially after activity. (*Id.*) "[Y]esterday," for example, he "did a little bit of yard work . . . at the house and today it's stiff and sore . . . ." (*Id.*) He had worked in a tool factory for nearly a decade before he had surgery in 2008. (Tr. at 310.) Afterwards, he was fired because he "couldn't stand for very long." (*Id.*) But he traced his health's recent descent to the injury he sustained in October 2009. (Tr. at 309) "I was working then," he explained, "and they put me on a sit down job . . . Sitting for eight hours bothers my foot even more." (*Id.*) However, he did not take prescription medications and had not seen a doctor for two years. (*Id.*)

14

His inability to work and the fact he had not worked in two years sent him into depression. (*Id.*) He felt depressed and fatigued, never happy; yet he did not contemplate suicide and, further stated, "I get along well with people . . . I don't have trouble relating to people out in public." (*Id.*) He had a pleasant childhood and maintained good relationships with his siblings and parents. (*Id.*) After finishing high school, he attended college for two semesters and "did good there." (*Id.*) He currently had a good relationship with his girlfriend. (*Id.*) He had a large group of friends, though "[l]ately I haven't been doing anything with them," he lamented. (*Id.*)

Hobbies included camping, fishing, and hunting. (*Id.*) The previous summer he camped and fished; and, he recalled, "I went deer hunting one day last year and that's all I could tolerate," adding that he drove a golf cart to the deer blind to avoid walking. (*Id.*) Television filled four to six hours of his days. (*Id.*) He lived with his girlfriend and their pets, a dog and cat. (Tr. at 310-11.) On a typical day he woke in the morning, ate, "[did] things around the house that need[ed] to be done," fed the animals, watched television, and sat outside or worked in the yard if the weather permitted. (*Id.*) He could also do housework, such as cleaning dishes and sweeping, cooking "a little bit," and shopping with his girlfriend, leaning on the store cart for support. (*Id.*) He had no trouble driving alone. (Tr. at 311.)

Dr. Pestrue observed that Plaintiff was punctual, appropriately attired and washed, walked with a moderate limp, had an "alert but moderately depressed" look and mood, spoke clearly, and "was friendly, cooperative, verbal[,] and spontaneous." (*Id.*) His comments "showed fair insight into his status" and were logical; but he displayed "somewhat poor" self-esteem and "somewhat" dampened motivation. (*Id.*) Neither delusions nor suicidal ideations accompanied his depression. (*Id.*) Sleep sometimes proved difficult and his weight had increased over the past two years. (*Id.*)

15

Despite appearing "moderately depressed," he did not seem "significantly anxious, tense, angry, suspicious[,] or fearful." (Tr. at 311-12.) Dr. Pestrue concluded that Plaintiff's primary issues were physical; his resultant "depression should not prevent him from working." (Tr. at 313.) He had mild, single episode depression and Dr. Pestrue assigned a Global Assessment of Functioning score of sixty, indicating "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text rev. 2000).

Dr. A. Neil Johnson provided a consultative physical examination on April 2, 2012. (Tr. at 315-17.) The notes provide the best history of Plaintiff's ordeal with his ankles. Plaintiff's first foot surgery came in 2007, when "a podiatrist removed a spur from his left foot." (Tr. at 315.) Dr. Biddinger later diagnosed flatfoot caused by the fusion of his heel and navicular bones; or, in medical argot, "severe fixed plano valgus deformity secondary to calcaneonavicular tarsal coalition." (*Id.*) Then came the March 2008 surgery, excising the "coalition," or connection. (*Id.*) The pain persisted, "at least [at level] 5 out of 10," and Dr. Biddinger informed Plaintiff he "could do nothing more." (*Id.*) He reinjured his foot in October 2009 and "last worked as a truck driver on May 24, 2010." (*Id.*) He took Ibuprofen "as needed." (*Id.*) Plaintiff estimated he "could sit 6 hours, probably stand 4 hours and walk 1/4 of a mile" with pain, but could not climb a ladder, squat, run, or hop. (*Id.*) Briefly mentioning his mental state, Plaintiff again denied suicidal thoughts, mentioned he watched television and used the computer, and denied having any hobbies. (*Id.*)

Dr. Johnson wrote that Plaintiff "walked with an antalgic small stepped gait with [a] moderately severe limp without . . . an assistive device." (Tr. at 316.) He later characterized this as a "severe limp." (Tr. at 317.) Examination confirmed the pes lanus, as well as the painful motions of his left ankle. (Tr. at 316.) Plaintiff struggled to walk on his heels and toes, "could squat very little holding onto the table," and could not hop. (*Id.*) His left foot had mild weakness. (Tr. at 317.) Dr. Johnson concluded abruptly, "He should avoid heights, inclines and uneven surfaces. He shouldn't be around moving machinery." (*Id.*)

On the same day, radiological imaging was taken of Plaintiff's ankles. (Tr. at 318-19, 323-24.) The right ankle was normal. The radiologist observed no fractures, distortions, or soft tissue swelling, and only minimal "talar beaking" and a "minimal" heel spur. (Tr. at 318, 323.) The report concluded, "No suspicious radiographic abnormalities are seen. Ankle mortise is unremarkable." (*Id.*) Imaging on the left ankle did not reveal "any acute fracture," "destructive process," or "significant soft tissue swelling." (Tr. at 319, 324.) The surgical screws appeared in the results, as did a heel spur. (*Id.*) The radiologist's assessment stated, "No acute-appearing pathology demonstrated." (*Id.*)

Dr. Quan Nguyen, a consulting physician, reviewed Plaintiff's file on April 13, 2012. (Tr. at 77-79.) He constructed a functional capacity report for the period after May 20, 2010. (*Id.*) Plaintiff could occasionally (up to one-third of an eight-hour workday) lift and carry twenty pounds; frequently (two-thirds of an eight-hour workday) lift and carry ten pounds; and stand or walk for about six hours and sit for the same amount in a workday. (Tr. at 77.) Additionally, he could occasionally crawl and climb ramps and stairs; frequently balance; never climb ladders; and he had no restrictions on stooping, kneeling, and crouching. (Tr. at 77-78.) Finally he should avoid

"even moderate exposure" to hazards, such as machinery and heights. (Tr. at 78.) Dr. Nguyen explained that while Plaintiff limped, he could walk one-fourth of a mile–more than a block–and climb a flight of stairs; and further the x-rays were unremarkable. (*Id.*) Consequently, Dr. Nguyen determined there was "no significant material changes" and the prior ALJ decision of light work should be adopted. (*Id.*)

On July 3, 2012, occupational therapist Lisa Lemke conducted a physical performance test to "determine [Plaintiff's] maximum physical capabilities." (Tr. at 330.) Plaintiff's chief complaints were left ankle edema, immobility, and pain–usually at level five-out-of-ten, but sometimes as high as level ten. (Tr. at 332.) He currently took Naproxin and Tramadol. (*Id.*) He completed daily activities with moderate independence. (*Id.*) He reported that he planned "to work for a company, with restrictions when established, following this functional physical performance test." (*Id.*) Six hours of daily work was all he could tolerate currently. (*Id.*) Ms. Lemke noted that Plaintiff's left ankle appeared "slightly larger than the right." (Tr. at 333.) Squatting was difficult, so she recommended jobs that did not force him frequently to lift objects from the floor to his waist. (Tr. at 330.) He "move[d] at a steady pace," except when placing weight onto his left leg; his left leg limped consistently and demonstrated inflexibility. (*Id.*) His strengths included "[g]ood upper body strength, sitting tolerance, short walking tolerance[], coordination, hand grip, and dexterity skills . . . ." (*Id.*) His vocational limitations included the need to change between sitting and standing; he could frequently bend and reach; he could occasionally climb stairs, kneel, lift to his shoulders or overhead, and twist; and he could not squat, crawl, climb ladders, or balance. (Tr. at 330-31.) Overall, he could take positions in the sedentary and light categories. (Tr. at 330.)

Plaintiff began seeing nurse practioner Carol Borchardt on July 26, 2012. (Tr. at 339-40.) He visited the first time to establish care. (Tr. at 340.) He also mentioned his left ankle problems and occasional shortness of breath; but he denied neck or lower back pain. (Tr. at 339-40.) He rode his bicycle and had lost twelve pounds in the last three weeks. (*Id.*) The notes state he answered "yes" to depression screening questions, (Tr. at 340), but also that he "denie[d] any anxiety and depression." (Tr. at 339.) Ms. Borchardt observed left ankle weakness and remarked that his gait was antalgic. (*Id.*) She diagnosed hypertension, adiposity, chronic left ankle pain, and shortness of breath. (*Id.*) Plaintiff returned in October with bronchitis caused by exposure to allergens after "working outside with wood . . . ." (Tr. at 338.)

## 2.    Functional Self-Report and Administrative Hearing

On January 20, 2012, Plaintiff's girlfriend, Erin Hill, filled out a Function Report concerning Plaintiff. (Tr. at 171-78.) They had known each other for one year and spent significant time together each day. (Tr. at 171.) He helped with household tasks, though chores requiring prolonged standing proved difficult and required frequent breaks. (*Id.*) For example, Plaintiff only fed the animals and let them out; Ms. Hill walked them and did "anything that require[d] more standing [and] activity." (Tr. at 172.) Pain beset Plaintiff throughout the day, sometimes keeping him up at night or forcing him to bed early so he could sleep away the pain. (*Id.*) He could complete personal care tasks, Ms. Hill admitted, adding the consistent proviso that prolonged standing increased his pain. (Tr. at 172-73.) He could prepare meals for them both. (Tr. at 173.)

He completed various chores, "any light duty," including "dishes, laundry, ironing," cutting the lawn on a riding mower, and filling bird feeders. (*Id.*) He walked outside and could drive as well. (Tr. at 174.) He shopped, leaning on the cart for stability and resting afterwards. (*Id.*) The

impairments did not affect his ability to handle money. (*Id.*) Hobbies included reading, watching television–"minimally," she added–and camping with family in the summer. (Tr. at 175.) He spent time with others daily, but did not attend regular social activities. (*Id.*) Walking for less than a mile required a twenty minute rest, she estimated. (Tr. at 176.) He still used his specialized shoe inserts. (Tr. at 177.)

Plaintiff attended an administrative hearing in front of ALJ McGuire on October 23, 2012. (Tr. at 30.) Plaintiff's attorney began by noting that the left ankle's condition had further deteriorated since the last ALJ decision, causing him to lose his breath when walking and requiring him "to elevate his foot throughout the day, at least . . . four to six hours per day." (Tr. at 33.) The ALJ observed that generally a doctor needed to recommend leg elevation before the Commissioner would find that such a limitation rendered a claimant disabled. (Tr. at 34.) "We don't have any medical records that indicate a need to elevate a leg do we?" the ALJ asked. (*Id.*) The attorney replied that Plaintiff "does have to do this," but conceded that no such records existed. (*Id.*)

The ALJ initially had no questions for Plaintiff, so the attorney examined him instead. (Tr. at 35.) The left ankle pain was constant, usually around level five or six on a ten-point VA scale, sometimes flaring to a nine. (Tr. at 36.) The pain was "slowly getting worse," Plaintiff claimed. (*Id.*) He estimated that the pain medication he took allowed him to work on household chores for about four hours before the pain returned and he needed "to sit down and elevate" his ankle. (Tr. at 37.) During the "flare-ups," however, he could not complete any chores. (Tr. at 37-38.) The pain woke him in the night, generally cutting his sleep to four hours and leading him to nap for a few hours during the day. (Tr. at 38.) He estimated he could sit in a chair for four hours before the pain increased and his ankle swelled. (Tr. at 39.) He elevated his ankle above waist level at night and

20

for about four hours during the day. (Tr. at 40.) Standing in one spot was tolerable for thirty minutes; if he could move while standing, he lasted three hours on his feet. (Tr. at 40-41.) A quarter of a mile was the farthest he could walk without aggravating his ankle. (*Id.*) Bending down to touch the floor was not an issue, but he could not squat. (Tr. at 41.) He also struggled climbing stairs. (*Id.*) Due to his problems, he was certain that he would miss more than two days of work per month if he had a job. (Tr. at 42.)

The ALJ then began asking questions. (*Id.*) Plaintiff testified that he mostly watched movies and never attended social events on a regular basis. (Tr. at 43.) As a truck driver, the company "recommended" lifting seventy-five pounds, but he guessed that the most he lifted was fifty. (Tr. at 43-44.) His work as a machinist required him to lift up to 100 pounds. (Tr. at 44-45.) His other jobs only required him to lift around thirty to fifty pounds. (Tr. at 45-46.) Plaintiff then stated he had two surgeries on his left ankle, the first removed a heel spur and the second was a reconstructive surgery. (Tr. at 46.) Afterwards, the doctor "told me there was nothing more he can do to it," Plaintiff testified. (*Id.*) The problem arose again after his fall in October 2009. (*Id.*) Asked if losing weight would help, Plaintiff responded that he had dropped weight by riding a stationary bicycle in his living room, generally for thirty-minutes, elevating his leg afterwards. (Tr. at 46-47.)

The ALJ then asked the vocational expert ("VE") to

assume an individual of Mr. Osborn's age, education, vocational background, who could on occasion lift or carry 20 pounds, frequently 10; who could stand, walk or sit for six hours in an eight hour day, provided he had a sit/stand option at will; could push or pull 20 pounds; could engage in occasional postural activities; but no climbing, crouching, squatting; and needs to avoid unprotected heights and dangerous machinery.

21

(Tr. at 48-49.) Could that person perform Plaintiff's past work? he asked. (Tr. at 49.) He could not, the VE responded, but there were other jobs at the "light" exertional level that such an individual could undertake: office helper, (3700 positions in Michigan); information clerk, (18,500 positions in Michigan); and mail room clerk, (3200 positions in Michigan). (Tr. at 49.) Missing two or more days per month precluded all competitive work, as would elevating his leg at waist height more than fifteen percent of the workday. (Tr. at 50.)

### F.   Analysis and Conclusions

### 1.   Legal Standards

The ALJ determined that since the prior decision, Plaintiff had new limitations. (Tr. at 21-22.) He had the residual functional capacity ("RFC") to perform a limited range of light work: "[T]he claimant must be able to sit and/or stand at will and should only perform postural activities on occasion with the exception of no climbing, crouching, or squatting. The claimant must also avoid unprotected heights and dangerous machinery." (Tr. at 21.) Light work

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

## 2.   Substantial Evidence

If the Commissioner's decision applied the correct legal standards and is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence could justify the opposite conclusion. 42 U.S.C. § 405(g); *McClanahan*, 474 F.3d at 833; *Mullen*, 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Plaintiff's lone contention asserts that the ALJ erred in relying on the VE's testimony because the hypothetical he posed "did not accurately portray [his] impairments." (Doc. 9 at 7.) Because the hypothetical matched the RFC, Plaintiff essentially disagrees that substantial evidence supports the ALJ's RFC. (*Id.*); (Doc. 12 at 7.) His statement of the law begins by citing treating source rules despite the absence of any argument that treating sources exist in this case. (Doc. 9 at 8-9.) Indeed, his analysis of the evidence fails to cite any record outside his hearing testimony. (*Id.* at 9-11.) The argument simply recounts his testimony, attempting to show that it establishes Plaintiff's need to miss more than two days of work per month and his need to elevate his foot more than fifteen percent of the day; either would preclude work, according to the VE. (*Id.* at 10.) Plaintiff then asserts that forcing him to comply with the RFC would render him "completely incapacitated," an "inhumane" imposition, he concludes. (*Id.*) A series of conclusory statements and lengthy paraphrases of the ALJ opinion–the RFC and credibility conclusion–follow through the end of his brief. (*Id.* at 10-11.)

### a.   Res Judicata

In the Sixth Circuit, a prior decision by the Commissioner can preclude relitigation in subsequent cases:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

AR 98-4(6), 1998 WL 283902, at *3 (acquiescing to *Drummond v. Commissioner*, 126 F.3d 837 (6th Cir. 1997)). The regulations also explicitly invoke *res judicata*: An ALJ can dismiss a hearing request where "res judicata applies in that we have made a previous [final] determination or decision under this subpart about your rights." 20 C.F.R. §§ 404.957, 416.1457. *Res judicata* is somewhat a misnomer in this context. As the Third Circuit explained, *res judicata* formally "consists of two preclusion concepts: issue preclusion and claim preclusion." *Purter v. Heckler*, 771 F.2d 682, 689 n.5 (3d 1985); *see also Groves v. Apfel*, 148 F.3d 809, 810 (7th Cir. 1998) (Posner, J.) (discussing the "collateral estoppel branch of *res judicata*" in Social Security cases). Claim preclusion prevents renewing a judgment on the same cause of action; issue preclusion, or collateral estoppel, is less expansive, "foreclosing relitigation on all matters that were actually and necessarily determined in a prior suit." *Id.*

The *res judicata* effect of past ALJ decisions is actually a form of collateral estoppel precluding reconsideration of discrete factual findings and issues. *See Brewster v. Barnhart*, 145 F. App'x 542, 546 (6th Cir. 2005) ("This Court will apply collateral estoppel to preclude reconsideration by a subsequent ALJ of factual findings that have already been decided by a prior ALJ when there are no changed circumstances requiring review.").[2] The Commissioner's internal

---

[2] The Sixth Circuit has not decided "whether a party asserting collateral estoppel in a Social Security case . . . must establish the traditional elements of collateral estoppel." *Brewster*, 145 F. App'x at 547. *See also Caudill v. Comm'r of Soc. Sec.*, 424 F. App'x 510, 514-15 (6th Cir. 2011) (suggesting that the elements do not apply); *id.* at 519-21 (White, J., dissenting in part) (noting that Sixth Circuit unpublished decisions and other authority "strongly

guide explains the different issues and factual findings precluded by *res judicata* under *Drummond*. Soc. Sec. Admin., *Hearings, Appeals, and Litigation Law Manual*, § I-5-4-62, 1999 WL 33615029, at *8-9 (Dec. 30, 1999) (hereinafter "*Hallex*"). These include the RFC and various other findings along the sequential evaluation process, such as "whether a claimant's work activity constitutes substantial gainful activity," or whether she meets or equals a listing. *Id.*

In any case, evidence of "changed circumstances" after the prior decision allows the ALJ to make new findings concerning the unadjudicated period without disturbing the earlier decision. *See Bailey ex rel. Bailey v. Astrue*, No. 10-262, 2011 WL 4478943, at *3 (E.D. Ky. Sept. 26, 2011) (citing *Drummond*, 126 F.3d at 842-43). In other words, even though the first ALJ did not make any findings concerning later periods, her decision still applies to those periods absent the requisite proof. Thus, as applied in this Circuit, the AR 98-4(6) and *Drummond* essentially create a presumption that the facts found in a prior ruling remain in a subsequent unadjudicated period unless "there is new and material evidence" on the specific finding at issue. *See Makinson v. Colvin*, No. 5:12CV2643, 2013 WL 4012773, at *5 (N.D. Ohio Aug. 6, 2013) (adopting Report & Recommendation) ("[U]nder *Drummond* and AR 98-4(6), a change in the period of disability alleged does not preclude the application of *res judicata*.") (citing *Click v. Comm'r of Soc. Sec.*, No. 07-13521, 2009 WL 136890, at *4 (E.D. Mich. Jan. 16, 2009))); *cf. Randolph v. Astrue*, 291 F. App'x 979, 981 (11th Cir. 2008) (characterizing the Sixth Circuit's rule as creating a presumption); *Chavez v. Bowen*, 844 F.2d 691, 693 (9th Cir. 1988) ("The claimant, in order to overcome the presumption of continuing nondisability arising from the first administrative law

suggest that traditional rules of collateral estoppel should apply to the decisions of ALJs in social security disability cases"); *Rogers v. Comm'r of Soc. Sec.*, 225 F.3d 659, 2000 WL 799332, at *4 (6th Cir. 2000) (applying one of the elements in a Social Security case).

judge's findings of nondisability, must prove 'changed circumstances' indicating a greater disability." (quoting *Taylor v. Heckler*, 765 F.2d 872, 875 (9th Cir. 1985))).

In *Drummond*, for example, the court held that the first ALJ's RFC applied to a subsequent period unless the circumstances had changed. 126 F.3d at 838-39, 843. *See also Priest*, 3 F. App'x at 276 (noting that in order to win benefits for a period after a previous denial, the claimant "must demonstrate that her condition has so worsened in comparison to her condition [as of the previous denial] that she was unable to perform substantial gainful activity"); *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1232-33 (6th Cir. 1993) (same). The Sixth Circuit made this clear in *Haun v. Commissioner of Social Security*, rejecting the argument that *Drummond* allowed a second ALJ to examine de novo the unadjudicated period following the first denial. 107 F. App'x 462, 464 (6th Cir. 2004).

To overcome the presumption that the claimant remains able to work in a subsequent period, the claimant must proffer new and material evidence that her health declined. The Sixth Circuit has consistently anchored the analysis on the comparison between "circumstances existing at the time of the prior decision and circumstances existing at the time of the review . . . ." *Kennedy v. Astrue*, 247 F. App'x 761, 768 (6th Cir. 2007). In a case predating *Drummond*, the court explained, "[W]hen a plaintiff previously has been adjudicated not disabled, she must show that her condition so worsened in comparison to her earlier condition that she was unable to perform substantial gainful activity." *Casey*, 987 F.2d at 1232-33. Later, it reiterated, "In order to be awarded benefits for her condition since [the previous denial], Priest must demonstrate that her condition has . . . worsened in comparison to her [previous] condition . . . ." *Priest v. Soc. Sec. Admin.*, 3 F. App'x 275, 276 (6th Cir. 2001). The ALJ must scan the medical evidence "with an

26

eye toward finding some change from the previous ALJ decision . . . ." *Blackburn v. Comm'r of Soc. Sec.*, No. 4:11-cv-58, 2012 WL 6764068, at *5 (E.D. Tenn. Nov. 14, 2012), *Report & Recommendation adopted by* 2013 WL 53980, at *1 (E.D. Tenn. Jan. 2, 2013).

Thus, the evidence must not only be new and material, but also must show deterioration. *Drogowski v. Comm'r of Soc. Sec.*, No. 10-12080, 2011 WL 4502988, at *8 (E.D. Mich. July 12, 2011), *Report & Recommendation adopted by* 2011 WL 4502955, at *4 (E.D. Mich. Sept. 28, 2011). In *Drogowski*, for example, the court rejected the plaintiff's argument that a medical report met this test simply because it was not before the first ALJ. *Id.* at *2, 8-9. These decisions make clear that the relevant change in circumstances is not a change in the state of the available evidence, but a change in Plaintiff's condition.

### b.  Medical Source Evidence, Plaintiff's Credibility, and the RFC

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B); *accord* 20 C.F.R. § 404.1520(a)(3); *Wyatt*, 974 F.2d at 683. The regulations carve the evidence into various categories, but the only relevant distinction for present purposes is between "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). There are important differences between the two types of sources. For example, only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2.

Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her residual functional capacity. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources, including treating opinions not given controlling weight, 20 C.F.R. § 404.1527(c), and the ALJ should almost certainly use the same analysis for "other source" opinions as well. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at *2. The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. *See also* 20 C.F.R. § 404.1527(c).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-

2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion[, including treating sources]," regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's residual functional capacity ("RFC"),[3] and the application of vocational factors. *Id.* § 404.1527(d)(3).

Additionally, a physician's "notation in his notes of a claimed symptom or subjective complaint from the patient is not medical evidence; it is the 'opposite of objective medical evidence.' . . . An ALJ is not required to accept the statement as true or to accept as true a physician's opinion based on those assertions." *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011) (quoting *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010)) "Otherwise, the hearing would be a useless exercise." *Id. See also Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (noting that there was no medical opinion in "Dr. Kllefer's pain-related statement . . . [because] it merely regurgitates Francis's self-described symptoms."); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009) ("[S]ubstantial evidence supports the ALJ's determination that the opinion of Dr. Boyd, Poe's treating physician, was not entitled to deference because it was based on Poe's subjective complaints, rather than objective medical data.").

---

[3] The Commissioner's discretion to determine the claimant's RFC is less capacious than it appears at first. While the ALJ determines the RFC, the ALJ might be required to give controlling weight to treating source opinions on specific limitations. *See* 20 C.F.R. § 404.1513(b)-(c) (describing that medical reports can include a source's "statement about what [the claimant] can still do despite [her] impairments"). These opinions would necessarily affect the RFC. *See Green-Young v. Barnhart*, 335 F.3d 99, 106-07 (2d Cir. 2003) (holding that treating physician's opinion that claimant could not sit or stand for definite periods "should have been accorded controlling weight").

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ can properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision). "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights." *Cole*, 2011 WL 2745792, at *4. "[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

When a disability determination that would be fully favorable to a claimant cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No.

09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner*, 375 F.3d at 390. However, "[i]f an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky*, 35 F.3d at 1036.

The social security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "'objective evidence of the pain itself'" is not required, *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)    [D]aily activities;

(ii)   The location, duration, frequency, and intensity of . . . pain;

31

(iii)   Precipitating and aggravating factors;

(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)   Treatment, other than medication, . . . received for relief of . . . pain;

(vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3). *See also Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers*, 486 F.3d at 247. *See also Cruse*, 502 F.3d at 542 (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones*, 336 F.3d at 475 ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless [she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most [she] can

still do despite [her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). The Plaintiff bears the burden of proof during the first four stages of analysis, including proving her RFC. *Jones*, 336 F.3d at 474; *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). At step five, the Commissioner does not have add anything to the RFC, 20 C.F.R. § 404.1560(c), and consequently the burden to prove limitations remains with the Plaintiff at this stage. *Roby v. Comm'r of Soc. Sec.*, 48 F. App'x 532, 538 (6th Cir. 2002); *DeVoll v. Comm'r of Soc. Sec.*, 234 F.3d 1267, 2000 WL 1529803, at *3 (6th Cir. 2000) (unpublished table decision); *Her*, 203 F.3d at 391-92. The hypothetical is valid if it includes all credible limitations developed prior to step five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Mich. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 2009).

### c.     Analysis

Plaintiff's brief fails to address the threshold *res judicata* issue. The ALJ could veer from the prior decision only to the extent new and material evidence showed Plaintiff's condition had deteriorated. *See Drummond*, 126 F.3d at 842; AR 98-4(6), 1998 WL 283902, at *3. The only evidence Plaintiff cites is his hearing testimony, which fails to provide the proof usually required to overcome *res judicata*. *Cf. Price v. Comm'r of Soc. Sec.*, No. 2:12-15209, 2013 WL 6549657, at *9-10 (E.D. Mich. Dec. 13, 2013) (adopting Report & Recommendation) (noting that the medical source opined the claimant's condition had worsened). Truly "material" evidence warrants a new finding that the claimant can no longer meet the prior decision's RFC. *See Hallex*, § I-5-4-62, 1999 WL 33615029, at *7 (defining "material"). While an ALJ may not disregard the sort of subjective complaints Plaintiff exclusively relies on, SSR 96-7p, 1996 WL 374186, at *1, they are

not enough alone to establish an impairment. 20 C.F.R. § 404.1528(a). The "ALJ is not required to accept a claimant's subjective complaints," *Jones*, 336 F.3d at 475, and courts accord "great weight" to the ALJ's credibility analysis. *Cruse*, 502 F.3d at 542. Thus, assembling a selection of subjective complaints will not generally suffice to show a worsening impairment.

Here, the ALJ adequately dealt with those complaints and the objective evidence to devise a generous RFC. The record was thin. The unadjudicated period at issue began on May 20, 2010, the alleged onset date. (Tr. at 142.) The prior ALJ decision came down a month before, on April 23, 2010. (Tr. at 66.) Aside from subjective comments, the entire body of evidence from the relevant period consists of a mental consultative examination arranged by the state agency for the disability claim, (Tr. at 309-13); a consultative physical examination for the same purpose supplemented with two imaging studies, (Tr. at 315-19, 323-24); an occupational therapist's functional capacity opinion, completed after examining Plaintiff, (Tr. at 330-35); and reports from two visits to a nurse practioner, one to establish care and one to treat bronchitis. (Tr. at 338-40.) These reports provide scant proof of Plaintiff's complaints and the ALJ convincingly canvassed the record, showing how it failed to support Plaintiff's allegations. (Tr. at 22-23); *see* 20 C.F.R. § 404.1529(c)(3) (establishing treatment history as a credibility factor).

The ALJ referenced Plaintiff's testimony contradicting the alleged severity of his pain. (Tr. at 23.) Specifically, his daily activities included vacuuming, laundry, and other activities requiring him to remain on his feet. (*Id.*); *see* 20 C.F.R. § 404.1529(c)(3) (including daily activities as a credibility factor). Moreover, Plaintiff told the ALJ that with medication he could work on chores for four hours at a time before needing to rest his ankle, (Tr. at 37); that he could stand still for thirty minutes and stand for three hours if he could move, (Tr. at 40-41); walk one-quarter of a

34

mile, (*id.*); he could sit for four hours, (Tr. at 39); and he rode a stationary, recumbent bicycle in thirty-minute sessions for exercise. (Tr. at 46-47.) Other records include similar estimates from Plaintiff, some claiming even greater capabilities while few, if any, asserted he could do less. (Tr. at 309-11, 315, 339-40.) From this, the ALJ could conclude that some combination of sitting and standing was an appropriate work restriction. Accordingly, he added, among other things, a "sit and/or stand" option to the RFC. (Tr. at 21.)

Even considering Plaintiff's statement that he needed four to six hours to elevate his leg each day, (Tr. at 33), none of the testimony or application forms support greater RFC limitations. Indeed, Plaintiff's additional statements in the record further strengthen the ALJ's analysis.[4] Plaintiff told Dr. Pestrue that he still camped, fished and hunted, as recently as last year, though he did accommodate his ankle while hunting. (Tr. at 309.) His girlfriend confirmed that he camped. (Tr. at 175.) Moreover, he informed multiple sources that he worked outdoors. The daily activities he sketched for Dr. Pestrue included "some yard work" if the weather allowed. (Tr. at 311.) In fact, the day before that session he worked outside, though he claimed it caused soreness. (Tr. at 309.) The most recent record reveals that his bronchitis developed after "working outside with wood . . . ." (Tr. at 338.) The Function Report listed lawn mowing and filling bird feeders among his activities. (Tr. at 174.) Additionally, Plaintiff estimated to Ms. Lemke that he could currently work six hours per day, and he intended "to work for a company, with restrictions when established, following this functional physical performance test." (Tr. at 332.) This does not appear to have

---

[4] "The court may consider evidence in the record, regardless of whether it has been cited by the ALJ." *Blackburn v. Comm'r of Soc. Sec.*, No. 4:11-cv-58, 2012 WL 6764068, at *5 (E.D. Tenn. Nov. 14, 2012) (citing *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir.2001)). *Report & Recommendation adopted by* 2013 WL 53980, at *1 (E.D. Tenn. Jan. 2, 2013). The analysis that follows merely plugs additional facts into the ALJ's analysis; it does not construct new rationales or arguments for the ALJ's action.

been a vague aspiration to someday work, but a present assessment of his abilities and plans. *Cf.*

*Hill v. Comm'r of Soc. Sec.*, No. 13-CV-15257, 2014 WL 6686789, at *20 (E.D. Mich. Nov. 26,

2014) (adopting Report & Recommendation) (distinguishing hopes for the future from present

realities). These statements supplement Plaintiff's testimony and buttress the ALJ's analysis.

The ALJ also sufficiently addressed the objective evidence. In fact, any errors favored

Plaintiff. The ALJ noted that "since the claimant's prior decision, the record reveals that the

claimant has received additional treatment for his left ankle pain," citing Dr. Johnson's

consultative examination. (Tr. at 23.) However, none of the post-decision records demonstrate such

treatment. The two consultative examinations and the occupational therapist's opinion sought to

establish his functional capacity for the Commissioner, not treat symptoms or complaints. (Tr. at

309-35.) The first visit to Ms. Borchardt was introductory, while the second treated bronchitis. (Tr.

at 238-40.) Plaintiff admitted in March 2012 that he had neither taken prescription medications nor

visited a doctor in two years. (Tr. at 309.) The only ongoing treatment, or concession to his ankle

pain, over that period was his continued use of the personalized shoe inserts. (Tr. at 177, 231-34.)

The ALJ's minor mistake labeling Dr. Johnson's report as evidence of "additional

treatment" worked to Plaintiff's benefit, if it had any substantive effect at all, as treatment history

plays a role in the credibility analysis. 20 C.F.R. § 404.1529(c)(3). In any case, the ALJ properly

used the report to bolster his analysis. Dr. Johnson observed Plaintiff's moderate to severe limp,

as well as his difficulty with special walking tests, supporting the ALJ's decision to increase

Plaintiff's limitations. (Tr. at 23, 317.) The contemporaneous imaging studies failed to uncover

further objective support, (Tr. at 318-19, 323-24), however, and as the ALJ noted, Dr. Johnson's

only proposed limitation was that Plaintiff avoid hazardous environments. (Tr. at 317.)

Likewise, Ms. Lemke's opinion received adequate analysis. (Tr. at 23.) The ALJ noted that it was based on a series of performance tests, a relevant factor when analyzing an opinion. *See Wilson*, 378 F.3d at 544. *See also* 20 C.F.R. § 404.1527(c). The ALJ also properly pointed out that Ms. Lemke was not an "acceptable source," 20 C.F.R. § 404.1513, but following administrative rulings and Sixth Circuit precedent, *Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at *2, nonetheless proceeded with the multi-factor opinion analysis. (Tr. at 23.) He implemented many of her recommendations–which found he could work–in his RFC. (Tr. at 23, 330-33.) Concluding, he noted Ms. Borchardt's diagnoses in the two records from her office. (Tr. at 24.)

The ALJ's analysis sufficed to support his findings. He considered and explained the details of all Plaintiff's testimony, the Function Report, and all of the submitted and consultative medical evidence. (Tr. at 22-24.) He reasonably determined that the record indicated slightly stricter limitations than the previous findings, but not so strict as to find him disabled. If he erred at all, it was by giving too much credence to Plaintiff's complaints. Over two years had passed within the relevant period before Plaintiff sought any medical examination or treatments; and when he finally received them, they were consultative examinations arranged and required by the state agency to develop evidence concerning his disability application. Moreover, as the ALJ noted in his decision, no medical evidence suggested Plaintiff would miss more than two days per month, and no medical source suggested any limitations precluding work. (Tr. at 23-24.) At the hearing, the ALJ similarly observed, and Plaintiff's attorney admitted, that there were no "medical records that indicate  a need to elevate a leg . . . ." (Tr. at 34.) Thus, the only two severe restrictions Plaintiff offers come from his subjective complaints. Yet, Plaintiff's other statements pointed in

the opposite direction. The ALJ parsed his complaints and appropriately discredited the most extreme allegations.

Finally, the ALJ also wrote that he considered evidence from before the prior decision. (Tr. at 24.) Such evidence may "reinforce or illuminate or fill gaps in the evidence developed for the second proceeding." *Groves*, 148 F.3d at 811. However, in similar contexts, neither the commissioner nor the courts have required the second ALJ to review evidence from the file in front of the first. *See Collier v. Commissioner of Social Security*, 108 F. App'x 358, 362-63 (6th Cir. 2004) (rejecting the plaintiff's argument that "the Commissioner's failure to produce this earlier case file prevented the ALJ from applying the principles articulated in *Drummond* . . . ."); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 687 (6th Cir. 1992) ("[T]he ALJ need not consider this report because it related to plaintiff's condition prior to his alleged onset date of disability . . . ." ); *Slick v. Comm'r of Soc. Sec.*, No. 07-13521, 2009 WL 136890, at *5 (E.D. Mich. Jan. 16, 2009) (dismissing as "unpersuasive" a claim that "the current ALJ was obligated to obtain the record from his previous administrative hearing," questioning "what the current ALJ would have learned from . . . the previous administrative record"); *Hallex*, § I-5-4-62, 1999 WL 33615029, at *15 ("It may be possible to apply the [AR 98-4(6)] if the adjudicator can obtain a copy of the final ALJ or [Appeal Council] decision on the prior claim.").

In any case, the evidence pre-dating the first decision here adds weight to the ALJ's findings. X-rays from after his October 2009 fall were "normal," except for a heel spur. (Tr. at 228.) Records from Dr. Bach generally reported mild swelling and tenderness. (Tr. at 221, 225.) Similarly the physical therapy notes indicate that Plaintiff usually rated his pain between level two and five, (Tr. at 249, 250, 254,  257, 260, 263, 266, 269, 272, 284, 291, 300), around the same

level he reported at the recent hearing and other more recent records. (Tr. at 36, 332.) This indicates his condition did not significantly deteriorate. Other records show that by the end of the treatments, Plaintiff's left ankle had normal strength, he could do repetitions climbing ladders, and he could push and pull seventy-five pounds. (Tr. at 273, 275-76, 291-92, 304-05.) Thus, his prior condition was not so severe that the slight deterioration the second ALJ noted rendered him disabled.

### 3.    Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "'zone of choice' within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545), as the decision is supported by substantial evidence.

## III.    **REVIEW**

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis*

*v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  January 29, 2015                    /S PATRICIA T. MORRIS
                                           Patricia T. Morris
                                           United States Magistrate Judge